[No. 12895-1-II. Division Two. June 27, 1990.]

DANNY WILLIAMS, *as Guardian, Appellant,* v. KINGSTON INN, INC., ET AL, *Respondents.*

*Roger M. Leed,* for appellant.
*Gregory P. Norbut,* for respondents.

THOMPSON, J.*—Danny Williams, as guardian of the estates of his two minor sons and as personal representative of the estate of Claire Williams, his deceased wife, brought this wrongful death action against the Kingston Inn, Inc., and its owners.[1] He alleged the Kingston Inn negligently served alcohol to Claire Williams when it knew or should have known she was intoxicated, and that negligence was the proximate cause of the automobile accident in which Mrs. Williams lost her life. Mr. Williams appeals the dismissal of his action on summary judgment. We affirm.

The following evidence is set forth in the affidavits and depositions considered by the trial court:

Lori Eronson and Serene Tooze went to the Kingston Inn at about 6 p.m. on May 9, 1987. Their friend, Claire Williams, arrived a short time later. Ms. Eronson remembers buying Mrs. Williams a drink. They were at the bar 15 to 20 minutes. The three women left between 6 and 6:30 to return to Ms. Tooze's house so that Ms. Eronson and Ms. Tooze could get ready to go out to dinner. According to Ms. Eronson, Mrs. Williams did not appear to have been drinking before they met at the Kingston Inn, nor did she have anything to drink at Ms. Tooze's house.

Ms. Eronson recalls that they were at Ms. Tooze's for about an hour and a half. They returned to the Kingston Inn about 8, just as it was getting dark.[2] Ms. Eronson and Ms. Tooze left right away, but Mrs. Williams remained to talk with Paul Moran, who was sitting at the bar.

Kevin Williams was the bartender at the Kingston Inn that evening. He remembers that when he started his shift Mrs. Williams was seated at a table with Ms. Eronson. He made two coffee and brandy drinks for Mrs. Williams. She

---

*This appeal was heard by a panel of Division Three judges sitting in Division Two.

[1]The complaint also names Kitsap County, but Mr. Williams did not serve the County.

[2]In her affidavit, Ms. Eronson states they returned at 8:30.

left with her friends between 6 and 7. Sometime later, "about 8:00 or so", he saw Mrs. Williams with Paul Moran. Mr. Moran ordered a drink for her, but she said she wanted straight coffee. She never appeared intoxicated. He states it was still daylight when Mrs. Williams left.

Mr. Moran testified in his deposition that he thought Mrs. Williams returned to the Kingston Inn at approximately 7 p.m. When asked if it could have been 8:30, he responded: "I doubt it. I left there right after 9:00. It seemed like I talked to her for a couple of hours, but it just seemed like it." Although he offered to buy Mrs. Williams a drink, she did not want one. He noticed nothing about her that would make him think she had been drinking. Mr. Moran remembers leaving right after 9 to go across the street to another bar to listen to a band that started playing at that time. Mrs. Williams borrowed $5 from him for gas so that she could drive to visit her boyfriend in Suquamish. She left at the same time as Mr. Moran.

Michelle McDougall was in the bar at the Kingston Inn with her husband from 8:30 to 9:30 p.m. that evening. She remembers seeing Mr. Moran and Mrs. Williams there. It was dark outside at the time. Michael McDougall attested that when he drove their babysitter home at 11 p.m., he observed a yellow GMC station wagon ahead of him on Highway 104, heading west in the direction of Poulsbo. "The vehicle was all over the road." Mr. McDougall dropped back until the car turned left on Hansville Road. Mrs. Williams was driving the yellow GMC.

Shortly after Mr. McDougall lost sight of her, Mrs. Williams crossed the center line of Hansville Road and struck an oncoming vehicle head on. She was killed, as was the 66–year–old driver of the other car. The driver's 65–year–old wife, a passenger, was seriously injured. The police inventoried Mrs. Williams' car, but found no alcohol. A blood test showed her blood alcohol level was .32.

Raymond J. Davis, a forensic toxicologist, attested:

5. Assuming that Claire Williams drank no more than two drinks of brandy at the Kingston Inn between 6:00 p.m. to 6:30

p.m. on May 9, 1987, and had no alcohol prior to coming to the Kingston Inn that day, and assuming that each drink contained no more than 2 ounces of brandy at an alcohol concentration of 40% (80 Proof), and that Claire Williams returned to the Kingston Inn at approximately 8:30 p.m. on May 9, 1987, and that she then consumed a quantity of alcoholic beverages necessary to bring her blood alcohol concentration to 0.32%, I have calculated that Claire Williams would have had to ingest 15 ounces of 80 proof brandy between 8:30 p.m. and the time of her death. The Washington State Liquor Control Board disseminates widely, including to its licensees and their employees, information regarding the number of ounces of alcohol necessary to cause a person's blood alcohol concentration to exceed the legally established limit of 0.10%. This information also includes details concerning the length of time which is required by the body to metabolize alcohol relative to the person's lean body weight. Any person familiar with this information, including a bartender or bar server, would be aware that the ingestion of 15 ounces of 80 proof brandy during a period of no more than three hours, would cause a person of Claire Williams' height and weight to have a blood alcohol concentration substantially in excess of the legal limit and one which, according to literature distributed by the Washington State Liquor Control Board, would result in "severe impairment" for purposes of operating a motor vehicle.

The owner of Papa Joe's, the only other establishment in Kingston serving hard liquor, stated that Mrs. Williams was not a customer in her bar that evening.

Under the common law of this state, a commercial purveyor of alcoholic beverages owes a duty not to furnish intoxicating liquor to a person who is obviously intoxicated. *Christen v. Lee,* 113 Wn.2d 479, 488, 780 P.2d 1307 (1989); *Purchase v. Meyer,* 108 Wn.2d 220, 225, 737 P.2d 661 (1987). The trial court, finding no genuine issue of material fact, held as a matter of law the Kingston Inn had not breached its common law duty. Mr. Williams contends the court erred. He believes the evidence creates issues as to when Mrs. Williams left the Kingston Inn and the amount of alcohol the Kingston Inn served her.

█ "'[W]hether a person is "obviously intoxicated" or not is to be judged by that person's *appearance* at the time

the intoxicating liquor is furnished to the person.'" *Christen,* at 488 (quoting *Purchase,* at 223). "Accordingly, neither the results of a blood alcohol test nor the appearance of a person a substantial time after the intoxicating liquor was served constitutes sufficient evidence of obvious intoxication." (Footnotes omitted.) *Christen,* at 488–89; *Purchase.* The reason behind this rule is that the provider of alcohol ordinarily has no way of knowing how much a person has consumed before entering its establishment. A heavy drinker may be able to consume a great deal of alcohol without appearing intoxicated, and there are medically recognized variables in the way alcohol may react in the body. *Christen,* at 489; *Purchase,* at 225–26.

Mr. Williams relies upon *Dickinson v. Edwards,* 105 Wn.2d 457, 716 P.2d 814 (1986). Ersel Edwards, a Kaiser Aluminum & Chemical Corporation employee, attended an employer sponsored banquet at the Red Lion Inn. Within 5 minutes of leaving the banquet he negligently caused an automobile accident. The injured victim filed an action against Mr. Edwards, Kaiser and the Red Lion. In opposing Kaiser's and Red Lion's motions for summary judgment, the plaintiff submitted the affidavit of the officer who investigated the accident. He was at the scene in minutes and stated that Mr. Edwards was unsteady on his feet, had bloodshot eyes and a flushed face, smelled of alcohol, and was unable to perform physical tests to the officer's satisfaction. In his deposition, Mr. Edwards admitted consuming 15 to 20 drinks in the 3½ hours he was at the banquet. *Dickinson,* at 465.

The trial court granted Kaiser's and the Red Lion's motions for summary judgment. The dismissal was affirmed by the Court of Appeals but reversed by the Supreme Court, which concluded that the Superior Court and the Court of Appeals erred in not considering the affidavit of the police officer or the admissions made by Mr. Edwards as to the amount of alcohol he had consumed at the banquet. The court held that, in certain circumstances,

observations made after the drinker has left the defendant's establishment may raise an inference of obvious intoxication if they are made in close proximity to the time when the alcohol was consumed. *Dickinson,* at 464. Those circumstances include whether the drinker had consumed any alcohol after and independent of that furnished by the defendant, or whether any period was unaccounted for between the time the defendant last furnished alcohol and the subsequent observation was made. *Dickinson.* The court also held at page 465 that evidence of the amount of alcohol consumed could raise an inference of obvious intoxication *because it relates to the question of whether the intoxication was obvious or should have been obvious to the furnisher.*

Christen and *Purchase* distinguished *Dickinson* as "factually unique". *Christen,* at 491 (quoting *Purchase,* at 227). It is also quite different from the facts presented here. Unlike the trooper in *Dickinson,* Mr. McDougall observed Mrs. Williams some 2 hours *after* Mr. Moran said she left the Kingston Inn. Mr. Williams' attempt to discredit Mr. Moran's testimony is not persuasive. Mrs. McDougall said she and her husband were at the Kingston Inn from 8:30 to 9:30 p.m. and she saw Mrs. Williams and Mr. Moran there. She did not state, as Mr. Williams argues, that she saw them there at 9:30. Her testimony is consistent with that of Mr. Moran. Mr. Williams also relies upon Mr. Moran's testimony that he talked with Mrs. Williams for what "seemed" like 2 hours. The fact that Ms. Eronson testified that she and Mrs. Williams returned to the bar at 8 p.m. (or 8:30, as she says in her affidavit) does not mean that Mr. Moran was mistaken about when the two of them left the bar or that he must have talked to Mrs. Williams until at least 10:30.

Mr. Williams also relies upon *Dickinson's* consideration of evidence of the *amount* of alcohol consumed by the defendant. However, in *Dickinson,* the defendant *admitted* drinking 15 to 20 drinks at the Red Lion; here, the evidence Mr. Williams wants considered is the testimony of expert

Davis that Mrs. Williams' blood alcohol level indicates she ingested at least 15 ounces of alcohol. Unlike *Dickinson,* there is no evidence here that Mrs. Williams was served those 15 ounces by the Kingston Inn.

 Mr. Williams' argument that the expert's testimony is relevant was addressed by Justice Utter in a concurring opinion in *Burkhart v. Harrod,* 110 Wn.2d 381, 392, 755 P.2d 759 (1988):

> Even if expert testimony could establish the amount of alcohol consumed, the expert testimony here is not competent. The experts based their opinions on Burkhart having consumed alcohol only between 2 and 6 p.m. However, appellants contend that Burkhart continued drinking after dinner ended at 6:30 p.m. Burkhart may have drunk more alcohol after stopping at a store to buy beer . . . Even granting appellants every favorable inference . . ., the experts based their opinions on an inaccurate set of assumptions regarding when at the party Burkhart had consumed alcohol; the opinions must be considered speculative and irrelevant, and therefore inadmissible. *See, e.g., Myers v. Harter,* 76 Wn.2d 772, 781–82, 459 P.2d 25 (1969).

Similarly, expert Davis' opinion that the bartender should have known that Mrs. Williams was intoxicated is based upon an assumption that she did all of her drinking at the Kingston Inn. The evidence does not support such an assumption.

 Nevertheless, Mr. Williams contends that summary judgment is inappropriate because controlling facts in this case are particularly within the knowledge of the Kingston Inn. The cases relied upon by Mr. Williams involved situations in which the party moving for summary judgment had the only firsthand knowledge of the events in question. *Felsman v. Kessler,* 2 Wn. App. 493, 496–97, 468 P.2d 691 (landowner denied conspiracy to shoot and kill trespasser), *review denied,* 78 Wn.2d 994 (1970); *Michigan Nat'l Bank v. Olson,* 44 Wn. App. 898, 905, 723 P.2d 438 (affidavits contained self–serving statements concerning plaintiff's conversations with defendant's deceased husband), *review denied,* 106 Wn.2d 1011 (1986). In those circumstances, the courts held that the nonmoving party should have the opportunity to disprove such facts by cross examination

and by viewing the demeanor of the moving party while testifying. In contrast, the Kingston Inn and its employees were not the only ones to provide information as to events the evening in question. The McDougalls, Ms. Eronson, and Ms. Tooze all provided information. Mr. Moran also testified. Although he admitted being a regular at the Kingston Inn and knowing the owners, these admissions are not such that the court must discount his testimony.

Mr. Williams also argues that the Kingston Inn failed to secure an affidavit from the waitress who was on duty that evening or comply with his request for discovery of the names of employees who were working. He maintains these failures raise an inference the Kingston Inn was withholding testimony which would have been adverse to its position.

■ 5 K. Tegland, Wash. Prac., *Evidence* § 85, at 247 (3d ed. 1989) (quoting *State v. Baker,* 56 Wn.2d 846, 859, 355 P.2d 806 (1960)) states:

"The inference that witnesses available to a party would have testified adversely to such party arises only where, under all circumstances of the case, such unexplained failure to call witnesses creates a *suspicion* that there has been a willful attempt to withhold competent testimony."

(Italics ours.) *See also Wright v. Safeway Stores, Inc.,* 7 Wn.2d 341, 352, 109 P.2d 542, 135 A.L.R. 1367 (1941).

Here, the Kingston Inn maintains it has no record of the employees who worked that evening. Moreover, the fact that Mr. Moran's disinterested testimony confirms the bartender's version of events makes it even less likely that the Kingston Inn is willfully attempting to withhold competent testimony. In these circumstances, the fact the Kingston Inn did not produce the waitress is not suspicious.

Accordingly, we hold that the facts and reasonable inferences therefrom, even when considered in the light most favorable to Mr. Williams, support but one conclusion. The Kingston Inn is entitled to judgment as a matter of law.[3]

---

[3]We note that in some jurisdictions, Mr. Williams' action might fail for another reason. It has been held that the consumer of intoxicants cannot recover

Affirmed.

MUNSON and SHIELDS, JJ., concur.

for his own injuries against the one who furnishes him alcohol. The rationale is that the causative effect of the person supplying the liquor is terminated by the voluntary act of the plaintiff in drinking it. *See* 45 Am. Jur. 2d *Intoxicating Liquors* § 559, at 858 (1969); Annot., *Liability of Persons Furnishing Intoxicating Liquor for Injury to or Death of Consumer, Outside Coverage of Civil Damage Acts*, 98 A.L.R.3d 1230 § 3[b], at 1238 (1980), and cases cited there. We could not locate any Washington case which addressed this issue.